**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| MIGUEL ANGEL GONZALEZ-ARGUETA, | No. 25-557 |
| | Agency No. A216-541-857 |
| *Petitioner*, | |
| v. | OPINION |
| TODD BLANCHE, Attorney General, | |
| *Respondent*. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted February 4, 2026
Portland, Oregon

Filed August 13, 2026

Before: Carlos T. Bea, Morgan B. Christen, and Roopali H.
Desai, Circuit Judges.

Opinion by Judge Bea;
Concurrence by Judge Bea;
Concurrence by Judge Desai

# SUMMARY[*]

## Immigration

Denying Miguel Angel Gonzalez-Argueta's petition for review of the Board of Immigration Appeals' decision affirming the denial of asylum and withholding of removal, the panel concluded that Gonzalez-Argueta was ineligible for relief because he failed to demonstrate the requisite nexus between the claimed harm and his status as a former El Salvadoran police officer.

The panel held that substantial evidence supported the agency's nexus decision because all the threats Gonzalez-Argueta received occurred while he was an active police officer. Since Gonzalez-Argueta claimed persecution on account of his status as a former police officer, pursuant to Ninth Circuit precedent, the panel considered only the evidence of persecution he experienced after he exited the police force. Because Gonzalez-Argueta and his family have not been threatened since he became a former police officer, he failed to establish a nexus to his status as a former police officer.

Concurring, Judge Bea, joined by Judge Desai, joined Judge Desai's concurrence in full. Judge Bea wrote separately to emphasize the illogic of this Court considering only the mistreatment a petitioner experienced after he left the police force when a petitioner claims persecution on account of his status as a former police officer. Agreeing with Judge Desai, Judge Bea wrote that evidence of

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

mistreatment before the petitioner leaves the police force can be instructive of future harm on account of his status as a former police officer because it is the very essence of a particular social group of former police officers that they would be targeted on account of their having carried out their duties as active police officers.

Concurring, Judge Desai, joined by Judge Bea, concurred in the majority's decision in full, but wrote separately to urge our court to go en banc to revisit circuit precedent and articulate a reliable test for determining whether mistreatment is on account of "personal retribution" to avoid absurd results for former police officers. Judge Desai wrote that existing Ninth Circuit precedent misses two important nuances. First, a petitioner's status as a former police officer is often intertwined with the actions he took as an active police officer. Second, evidence of mistreatment before the petitioner leaves the police force can be instructive of future harm on account of his status as a former police officer.

---

## COUNSEL

Joseph A. Lear (argued), The Law Office of Joseph A. Lear, Portland, Oregon, for Petitioner.

Nelle M. Seymour (argued), Trial Attorney; Jessica E. Burns, Senior Litigation Counsel; Office of Immigration Litigation; Brett A. Shumate, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

BEA, Circuit Judge:

Petitioner Miguel Angel Gonzalez-Argueta [1] ("Gonzalez-Argueta") is a native and citizen of El Salvador who seeks review of a decision of the Board of Immigration Appeals ("BIA") dismissing his appeal of an Immigration Judge's ("IJ") decision denying his application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). He does not challenge the IJ's CAT decision. We have jurisdiction under 8 U.S.C. § 1252. Because Gonzalez-Argueta failed to demonstrate the requisite nexus between the claimed harm and his status as a former Salvadoran police officer, we deny the petition.

## I

Gonzalez-Argueta entered the United States without valid entry documents and admission or parole at Laredo, Texas, in February 2018. He was detained at the IAH Polk Adult Detention Facility. The Department of Homeland Security issued him a Notice to Appear in March 2018. Gonzalez-Argueta conceded removability, but applied for asylum, withholding of removal, and relief under CAT. The IJ found his testimony credible but denied all forms of relief.

Gonzalez-Argueta testified that he was a national civil police officer in El Salvador. Gonzalez-Argueta left El Salvador "[b]ecause the MS [Mara Salvatrucha] gang wanted to kill [him]." He became a target of MS-13 because he interfered with the criminal activities of Jose Francisco

---

[1] Gonzalez-Argueta's opening brief does not hyphenate his last name. This opinion does because the Immigration Judge's decision and Gonzalez-Argueta's I-589 Application hyphenate his last name.

Rosales Carbajal, a.k.a. "Killer," who was a "leader of that zone of the gangs."

On November 19, 2017, Gonzalez-Argueta was driving his vehicle when he passed two men on a motorcycle. When he drove by, he overheard one of the men say, "[t]his is the policeman that we are going to get." Gonzalez-Argueta recognized the person who said this as Killer. The men drew firearms and pursued him, but he was able to escape. Later that day, a boy, "who didn't live in the neighborhood," approached Gonzalez-Argueta while he was walking in the neighborhood where he lived. The boy asked him if he "was the policeman Gonzalez." When he answered in the affirmative, the boy said he had a message from Killer. The gang, through the boy, told Gonzalez-Argueta that he "had to leave [his] work and [he] had to leave [his] country." If he did not do as instructed, "they would kill [him] or start with [his] family." Despite Killer's message, Gonzalez-Argueta returned to work.

On December 7, 2017, Gonzalez-Argueta was "patrolling with three soldiers of the armed forces." He directed an oncoming vehicle to stop. Instead, the vehicle attempted to run him over. As the vehicle went by, Killer, who was in the vehicle, told Gonzalez-Argueta that "they were going to kill [him] because [he] had crossed their path." Gonzalez-Argueta and the soldiers pursued the vehicle. The people in the vehicle exited the vehicle and shot at Gonzalez-Argueta and the soldiers. Gonzalez-Argueta and the soldiers exchanged fire. No one was hit and the men escaped.

On December 10, 2017, Gonzalez-Argueta's brother, Fabian Domingo Gonzalez-Argueta ("Fabian") was driving Gonzalez-Argueta's car. Gonzalez-Argueta was not in the car. Three men stopped Fabian and surrounded his vehicle.

They told Fabian to tell Gonzalez-Argueta "[f]or this time, you save yourself, but by the next time, you are not going to live. And tell that son of a bitch that we have him well controlled. We are watching him very well, and we are going to kill him." Fabian was not harmed.

After what happened to Fabian, Gonzalez-Argueta decided to leave El Salvador and his work as a police officer. He and his family members have not been threatened since he left El Salvador. He believes if he returned to El Salvador, he would be targeted because "[i]n the area where [he] lived, they all knew that [he] was a member of the police force, and the gangs have controlled [sic] throughout the country, and they would always find out."

The IJ denied Gonzalez-Argueta's application for asylum and withholding of removal because his proposed particular social group of "former member of the Salvadorian [sic] police who worked effectively against gang members involved in an illegal gang/drug activity" was not cognizable. To aid Gonzalez-Argueta, the IJ deemed a second particular social group, "former members of the Salvadoran police," and determined it was legally cognizable. However, the IJ concluded that Gonzalez-Argueta failed to establish a nexus between past and future threats and his status as a former police officer. In an oral decision, the IJ denied his application for asylum, withholding of removal, and CAT protection, and ordered him removed to El Salvador. Gonzalez-Argueta appealed the IJ's decision as to asylum and withholding of removal to the BIA.

The BIA remanded the record to the IJ for a more detailed decision, which the IJ issued soon after. The IJ determined Gonzalez-Argueta failed to establish the

requisite nexus because "[r]ather than being harmed because he was a police officer, [Gonzalez-Argueta] was harmed because of his role in disrupting particular criminal activity." The IJ similarly concluded that any future harm would not be the result of his status as a former police officer, but "because of his role disrupting particular criminal activity." Therefore, the IJ denied his application for asylum and withholding of removal.  The IJ denied his application for CAT protection because he failed to demonstrate state action or deliberate state inaction.

The BIA, citing *Matter of Burbano*, 20 I. & N. Dec. 872 (BIA 1994), adopted and affirmed the IJ's denial of Gonzalez-Argueta's applications for asylum and withholding of removal under the INA.  Upon review, the BIA found no error in the IJ's findings regarding Killer's motive.  Gonzalez-Argueta appealed.

## II

"Where, as here, the BIA cites *Burbano* and also provides its own review of the evidence and law, we review both the IJ's and the BIA's decisions." *Ruiz-Colmenares v. Garland*, 25 F.4th 742, 748 (9th Cir. 2022) (citation omitted).  "We review for substantial evidence factual findings underlying the BIA's" and IJ's eligibility determinations for asylum and related relief. *Plancarte Sauceda v. Garland*, 23 F.4th 824, 831 (9th Cir. 2022). Reversal of a factual finding by the IJ and its affirmance by the BIA requires the petitioner to show that the evidence in the record "not only supports, but compels the conclusion" that the factual finding is erroneous.  *Cordon-Garcia v. I.N.S.*, 204 F.3d 985, 990 (9th Cir. 2000).

Substantial evidence supports the agency's nexus decision because all threats Gonzalez-Argueta received

occurred while he was an active police officer.  Since Gonzalez-Argueta claims persecution on account of his status as a former police officer, we consider only the evidence of persecution he experienced after he exited the police force.  *See Sanjaa v. Sessions*, 863 F.3d 1161, 1165 (9th Cir. 2017) (holding that this Court evaluates "the evidence of persecution [a petitioner] experienced *after* he quit his job" for a "particular social group of former police officers"); *Ayala v. Holder*, 640 F.3d 1095, 1097 (9th Cir. 2011) (same).  Gonzalez-Argueta and his family have not been threatened since he became a former police officer.

## III

Because Gonzalez-Argueta failed to demonstrate the requisite nexus between the claimed harm and his status as a former Salvadoran police officer, he is ineligible for asylum and withholding of removal.

**PETITION DENIED.**[2]

---

BEA, Circuit Judge, joined by DESAI, Circuit Judge, concurring:

I join Judge Desai's concurrence in full.  I write separately to emphasize the illogic of this Court considering only the mistreatment a petitioner experienced after he left the police force when a petitioner claims persecution on account of his status as a former police officer.  *See Ayala v. Holder*, 640 F.3d 1095, 1097 (9th Cir. 2011); *Sanjaa v.*

---

[2] The temporary stay of removal remains in place until the mandate issues.  The motion for a stay of removal, Dkt. 3, is otherwise denied.

*Sessions*, 863 F.3d 1161, 1165 (9th Cir. 2017). As Judge Desai aptly states, "evidence of mistreatment before the petitioner leaves the police force can be instructive of future harm on account of his status as a former police officer." Desai Concur. Op. at 11. In fact, it is necessarily instructive because it is the very essence of a particular social group of former police officers that they would be targeted on account of their having carried out their duties as active police officers.

To demonstrate my point, let us consider the facts in this case. Gonzalez-Argueta joined El Salvador's police force to "support [his] country" and combat "[t]he gangs. The MS." Unfortunately, Gonzalez-Argueta soon became a target of a local leader of MS-13, known as "Killer." Killer vowed to kill Gonzalez-Argueta or his family unless he quit the police force and left El Salvador. This was not an idle threat as Killer pursued Gonzalez-Argueta. One such encounter with Killer resulted in a shoot-out after Gonzalez-Argueta was almost run over by a vehicle. As the vehicle went by, Killer, who was in the vehicle, told Gonzalez-Argueta that "they were going to kill [him] because [he] had crossed their path." Afraid for his life and his family, Gonzalez-Argueta resigned from the police, fled El Salvador, and entered the United States. Gonzalez-Argueta applied for asylum, withholding of removal, and relief under the Convention Against Torture on account of his status as a "former member of the Salvadoran police."

Reading the above, one would assume that Gonzalez-Argueta has a strong claim—if not outright qualifies—for asylum because he would be targeted if he returned to El Salvador on account of him being a former a police officer. *See Cruz–Navarro v. I.N.S.*, 232 F.3d 1024, 1029 (9th Cir. 2000). But one would be wrong because such mistreatment

occurred while Gonzalez-Argueta was an active police officer and is therefore not considered by this Court. *See Ayala*, 640 F.3d at 1097–98; *Sanjaa*, 863 F.3d at 1165.

Not only does this not make sense, it creates a perverse incentive. For Gonzalez-Argueta to have had a successful asylum claim, he would have had to resign from the police force and then wait until Killer carried out his threats. Never mind that Killer was explicit that Gonzalez-Argueta had to quit the police force and leave El Salvador. That cannot be correct.

Therefore, I fully agree with Judge Desai that this Court should "reconsider its precedent on the nexus analysis for former police officers and adopt an approach that more meaningfully evaluates the causal link between the harm they face and their status as former police officers." Desai Concur. Op. at 17.

---

DESAI, Circuit Judge, joined by BEA, Circuit Judge, concurring:

I concur in the majority's decision in full. But I write separately to urge our court to go en banc to revisit our precedent and articulate a reliable test for determining whether mistreatment is on account of "personal retribution" to avoid absurd results for former police officers.[1]

To qualify for asylum or withholding of removal, a petitioner must show a nexus between his alleged persecution and a statutorily protected characteristic.

---

[1] Although this concurrence focuses on the particular social group ("PSG") of "former police officers," its reasoning and recommendations apply equally to PSGs of "former members of the military."

*Rodriguez-Zuniga v. Garland*, 69 F.4th 1012, 1018 (9th Cir. 2023). For asylum, the petitioner must show that his protected characteristic is a "central reason" for his persecution; for withholding, it need only be "a reason." *Id.*; 8 U.S.C. § 1158(b)(1)(B)(i); 8 U.S.C. § 1231(b)(3)(A). The nexus requirement thus "necessitates an assessment of the persecutors' motives." *See Parussimova v. Mukasey*, 555 F.3d 734, 739 (9th Cir. 2009).

This court has established that "mistreatment motivated purely by personal retribution will not give rise to a valid asylum claim." *Madrigal v. Holder*, 716 F.3d 499, 506 (9th Cir. 2013) (citing *Ayala v. Holder*, 640 F.3d 1095, 1098 (9th Cir. 2011)). In the context of former military officers, we have held that a persecutor is motivated by personal retribution when he targets a former officer "not because of his status as a former [military] officer," but "because, while an officer, he had arrested a particular drug dealer." *Ayala*, 640 F.3d at 1098 (citation modified). And when the PSG of "former police officers" is alleged, we consider only evidence of mistreatment *after* the petitioner left the police force to determine whether the evidence compels a finding of nexus. *Sanjaa v. Sessions*, 863 F.3d 1161, 1165 (9th Cir. 2017).

In my view, our nexus analysis in *Ayala* and *Sanjaa* misses two important nuances. First, a petitioner's status as a former police officer is often intertwined with the actions he took as an active police officer. Second, evidence of mistreatment before the petitioner leaves the police force can be instructive of future harm on account of his status as a former police officer. I thus urge our court to revisit our precedent governing asylum and withholding of removal applications by former police officers and modify our analysis to account for these circumstances. Specifically, we

should add an additional step to the nexus analysis to consider whether a persecutor's "retribution" is related to the petitioner's status as a former police officer. And we should consider evidence of mistreatment before the petitioner leaves the police force to the extent it is instructive of future harm.

## I.     A proper nexus analysis should consider whether personal retribution is related to the petitioner's status as a former police officer.

When the petitioner is a former police officer, the nexus analysis should not end solely because he was a victim of "personal retribution" for the actions he took as a police officer. Instead, if the mistreatment was due to personal retribution, a proper nexus analysis should include an additional step: the court should determine whether the retribution is related to the petitioner's status as a former police officer. If not, then it is proper to end the inquiry. But if the retribution is related to petitioner's previous role as a police officer, a petitioner's status would be at least "a reason" for his persecution. *See Rodriguez-Zuniga*, 69 F.4th at 1018; *Madrigal*, 716 F.3d at 506 ("Although mistreatment motivated purely by personal retribution will not give rise to a valid asylum claim, if a retributory motive exists alongside a protected motive, an applicant" may be able to establish nexus (citation omitted)).

In *Ayala*, we relied on the BIA's decision in *In Re C-A-*, 23 I. & N. Dec. 951 (BIA 2006). There, the BIA explained that "a former police officer could conceivably demonstrate persecution based upon membership in a particular social group of former police officers" if the officer "were targeted for persecution because of the fact of having served as [a] police officer[]." *Id.* at 958–59. But the BIA noted that in

other circumstances, "if a former police officer were singled out for reprisal, not because of his status as a former police officer, but because of his role in disrupting particular criminal activity, he would not be considered, *without more*, to have been targeted as a member of a particular social group." *Id.* at 959 (emphasis added). *In Re C-A-* did not, as *Ayala* suggests, establish a bright-line rule that a former police officer cannot show a nexus if he is persecuted because of actions he took in the line of duty.

This court's nexus approach in *Ayala* created a false dichotomy between a petitioner's "status as a former police officer" and "his role in disrupting particular criminal activity." 640 F.3d at 1098 (citation modified). But this imaginary line is far from clear and can lead to inconsistent or absurd results. After all, disrupting criminal activity is exactly what police officers are enlisted to do. Consider an example: one police officer guards the president at public events, and another investigates and arrests those who have attempted to assassinate the president. If both faced retaliation after they left the police force, the first officer could establish a nexus on account of her visibility and status as a former police officer, but the second could not establish a nexus because the persecution would be considered personal retribution for her actions "disrupting particular criminal activity." *Id.*; *cf. Velarde v. I.N.S.*, 140 F.3d 1305, 1312 (9th Cir. 1998). There is no meaningful distinction between the motives for targeting these two hypothetical petitioners, yet our nexus analysis would yield contrary results. Indeed, a petitioner who is persecuted because he was a police officer is no different from a petitioner who is persecuted for an act he committed because he was a police officer. Even if the persecution was a retaliatory act, if the petitioner "would not have [been] harmed" but for his status

as a former police officer, he can establish that his status as a former officer "was a cause of the persecutors' acts." *See Parussimova*, 555 F.3d at 741.

Adding a second step to determine whether a persecutor's retribution is related to the petitioner's status as a former police officer would meaningfully assess the causal connection between a petitioner's harm and his role as a former police officer. Relevant evidence at this step may include: (1) whether the petitioner only disrupted criminal activity because he was affiliated with the police, (2) the relationship between the petitioner and persecutor, (3) whether the persecutor would target others for disrupting criminal activity even if they were unaffiliated with the police, (4) instances of other police officers who are targeted for their actions, and (5) how society distinguishes between current and former police officers, if at all. This additional step in the nexus analysis would root out cases in which a former police officer is targeted solely for personal retribution and not based on his PSG. For example, if a former police officer steals from his neighbor and the neighbor later retaliates against him, the first step of the analysis would establish this harm as personal retribution. Under the second step, the retribution would be unrelated to the petitioner's status as a former police officer because it relates only to the officer's conduct in a personal dispute between neighbors.

Adopting this two-step approach is also consistent with our "mixed motive" precedent allowing claims to proceed even when the persecution is based in part on retaliation. *See Grava v. I.N.S.*, 205 F.3d 1177, 1181 n.3 (9th Cir. 2000) ("Purely personal retribution is, of course, not persecution on account of political opinion. . . . However, many persecutors have mixed motives."). In *Madrigal*, for

example, we determined that the petitioner's abuse was at least partly motivated by a gang's desire to intimidate former military members who participated in anti-gang drug activity, "even if revenge partially motivated" the gang. 716 F.3d at 506. Similarly, in *Garcia v. Wilkinson*, we held that the cartel orchestrated "sweeping retaliation towards [the petitioner's] family unit over time" that eventually rose to the level of animus that was potentially distinct from "purely personal retribution." 988 F.3d 1136, 1145 (9th Cir. 2021). And in *Grava*, we concluded that although corrupt supervisors personally retaliated against a whistleblower, their persecution was at least partly motivated by the whistleblower's political opinion. 205 F.3d at 1181–82 & n.3 ("[P]ersonal retaliation against a vocal political opponent does not render the opposition any less political, or the opponent any less deserving of asylum.").

In sum, to avoid absurd results for former police officers who were persecuted for their actions in the line of duty, a proper nexus analysis should first determine whether the mistreatment was due to personal retribution, then consider whether the retribution is related to the petitioner's status as a former police officer. If the retribution is related to the petitioner's status, the petitioner can establish nexus on account of his membership in the "former police officer" PSG.

## II. This court should consider evidence of mistreatment before the petitioner leaves the police force because it can be instructive of future harm on account of his status as a former police officer.

I also urge our court to close another gap in our precedent addressing former police officers. In *Sanjaa*, we declined to consider any evidence of mistreatment before the petitioner

left the police force. 863 F.3d at 1165. But evidence of persecution before a petitioner leaves the police force should "be considered to the extent it informs the analysis of whether [the petitioner] might be attacked going forward due to his status as a former police officer." *Martinez-Avelar v. Lynch*, 649 F. App'x 575, 577 (9th Cir. 2016).

In *Madrigal*, we grappled with this concept in the context of determining whether the petitioner's mistreatment rose to the level of persecution. 716 F.3d at 503–04. Although the court noted that "[m]istreatment suffered while an applicant was an active military member does not by itself provide a basis for asylum," the court reasoned that when "viewed as part of a course of conduct," the incidents of mistreatment "could justify or reinforce a finding of persecution." *Id.* at 504–05.

The same should be true when conducting a nexus analysis. As it stands, *Sanjaa* ignores mistreatment that occurred during a petitioner's time in the police force because it does not speak to whether the petitioner was persecuted on account of the PSG of "former" police officers. But even if mistreatment that occurred during a petitioner's time in the police force cannot establish nexus on its own, it could nonetheless "justify or reinforce" a finding of nexus when "viewed as part of a course of conduct." *See id.*

\*          \*          \*

In sum, this court should recognize that a petitioner's "status as a former police officer" is often intertwined with—or indistinguishable from—his former actions "disrupting particular criminal activity." Former police officers are not less deserving of asylum or withholding because they take actions in the line of duty that result in

persecution. This court should therefore reconsider its precedent on the nexus analysis for former police officers and adopt an approach that more meaningfully evaluates the causal link between the harm they face and their status as former police officers.